**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAROL P. SACHS,
                    *Plaintiff-Appellant,*

v.

REPUBLIC OF AUSTRIA; OBB
HOLDING GROUP; OBB
PERSONENVERKEHR AG,
                    *Defendants-Appellees.*

No. 11-15458

D.C. No.
3:08-cv-01840-
VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Submitted June 13, 2012*
San Francisco, California

Filed September 26, 2012

Before: Ronald M. Gould, Richard C. Tallman, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Tallman;
Concurrence by Judge Bea;
Dissent by Judge Gould

_____

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

11843

## COUNSEL

Geoffrey Becker, Becker & Becker, Lafayette, California, for appellant Carol P. Sachs.

Juan C. Basombrio, Dorsey & Whitney LLP, Costa Mesa, California, for appellees OBB Personenverkehr, AG.

---

## OPINION

TALLMAN, Circuit Judge, announcing the judgment of the Court:

In this case we consider what acts may be attributed to a foreign state in applying the commercial activity exception to immunity under the Foreign Sovereign Immunities Act.

Carol Sachs sued Austrian-owned OBB Personenverkehr after sustaining personal injuries as a result of her attempt to board a moving train in Innsbruck. The district court ruled that the commercial activity exception to the Foreign Sovereign Immunities Act did not apply and dismissed Sachs's suit for lack of subject matter jurisdiction. Sachs appeals the district court's order. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

I

In March 2007, Sachs purchased a Eurail pass in California from Rail Pass Experts, a company based in Massachusetts. A Eurail pass is a train ticket that allows passage on various railways of the Eurail Group, an association of thirty-one European railway transportation providers. Sachs's pass permitted travel in Austria and the Czech Republic. In April Sachs traveled to Austria, where she intended to originate her journey, and there purchased a sleeper upgrade to her ticket at a local train station. A few days later, on April 27, 2007, Sachs arrived at the Innsbruck train station and attempted to board a moving train. She fell to the tracks through a gap in the platform and suffered injuries that ultimately required the amputation of both legs above the knee.

OBB Personenverkehr ("OBB") is the Austrian national railway. OBB Holding Group ("Holding Group") owns 100% of OBB's stock. The Republic of Austria created Holding Group under Austrian railway law, and the Republic's Federal Ministry of Transport, Innovation and Technology is the sole shareholder of Holding Group. OBB is not required to pay income or corporate tax and, through its parent Holding Group, forwards all profits to the Austrian government.

The Eurail Group ("Eurail") is an association organized under Luxembourg law. OBB and thirty other European railways own Eurail. Eurail is a distinct legal entity and employs its own management and employees. Eurail is tasked with, among other things, the marketing and sale of Eurail passes.

Sachs filed a complaint in the Northern District of California against the Republic of Austria, Holding Group, and OBB. She asserted claims of negligence, design defect, failure to warn, and breach of the implied warranties of merchantability and fitness, premising federal jurisdiction on diversity. Holding Group was not served and is not a party to this case. The Republic of Austria and OBB moved to dismiss based on lack of subject matter jurisdiction. Sachs did not oppose Austria's motion and the district court granted it. The district court at first did not rule on OBB's motion, instead calling for supplemental briefing on whether the actions of Rail Pass Experts could be imputed to OBB. On January 28, 2011, the district court granted OBB's motion to dismiss after concluding that OBB was immune from suit. This appeal followed.

## II

**[1]** The "sole basis" by which courts in the United States may obtain jurisdiction over foreign states is the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, foreign states are presumptively immune from suit in federal and state courts, sub-

ject to a number of exceptions. *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1169 (9th Cir. 2010); *see also* 28 U.S.C. § 1604. These exceptions are found in 28 U.S.C. § 1605 and § 1607, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983), and "focus on actions taken by or against a foreign sovereign." *In re Republic of Phil.*, 309 F.3d 1143, 1150 (9th Cir. 2002). The exceptions include actions in which the foreign state has waived its immunity, 28 U.S.C. § 1605(a)(1), and actions involving the foreign state's successor interest in property located in the United States, *id.* § 1605(a)(4). "The two most commonly invoked exceptions to immunity, however, are those for commercial acts and for tortious acts." *Wolf v. Fed. Republic of Ger.*, 95 F.3d 536, 541 (7th Cir. 1996) (citing 28 U.S.C. §§ 1605(a)(2) & (a)(5)).[1]

Sachs, as the party bringing suit against a foreign state, must offer evidence that an exception to immunity applies. *See Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1021 (9th Cir. 1987). If she does so, OBB would bear

---

[1]The commercial activity exception withdraws immunity from a foreign state in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The tortious act exception, for its part, deprives a foreign state of immunity in cases

> not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

*Id.* § 1605(a)(5).

the burden of establishing by a preponderance of the evidence that the exception does not apply. *See id.* We review de novo a district court's determination regarding sovereign immunity under the FSIA. *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001).

### III

**[2]** The parties agree that the only exception relevant to this appeal is the commercial activity exception, which deprives foreign sovereigns of immunity in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). There is no dispute that OBB, as an "agency or instrumentality" of Austria, *id.* § 1603(a), constitutes a "foreign state" for the purposes of the FSIA.

Sachs's argument for jurisdiction is scattershot but is premised upon the fact that the sale of the Eurail pass by Rail Pass Experts is a commercial activity that should be imputed to OBB. Both parties agree that the purchase of the Eurail pass is the only commercial activity within the United States relevant to this case. But OBB denies that it was commercial activity *by the state* because any connection between Rail Pass Experts and OBB is so attenuated.

### A.

We previously grappled with the question of which acts could be attributed to a foreign state under the FSIA in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (per curiam), *cert. denied*, 130 S. Ct. 3497 (2010). John V. Doe, the plaintiff in that case, brought vicarious liability claims, among others, against the Holy See for the actions of its subordinates, including the Archdiocese of Portland, Oregon (Archdiocese), the Catholic Bishop of Chicago (Bishop), and the Order of the Friar Servants (Order). Doe alleged that Father Ronan, a member of the Order and priest in the Archdiocese, had sexu-

ally assaulted him when he was a teenager. *Id.* at 1069. The district court held that the commercial activity exception to immunity did not apply but that the tortious act exception did, thus granting it jurisdiction. *Id.* at 1071. The Holy See countered that it retained immunity from suit because the acts of the Archdiocese, the Bishop, and the Order could not properly be imputed to it for jurisdiction purposes. *Id.* at 1076.

On appeal, we recognized that "in applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state." *Id.* at 1079. We looked for guidance in *First National City Bank v. Banco para el Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611 (1983). In *Bancec*, the Supreme Court considered the inverse situation from the one we faced in *Holy See*—that is, when the actions of a foreign state could be attributed to its subordinate. *Id.* at 620. The Cuban government had established Bancec as an official credit union, owned all of its stock, and supplied its capital. *Id.* at 613-14. In 1960 Cuba nationalized all U.S. property in the country, including banks. Citibank had previously issued Bancec a letter of credit related to a sugar sale but, when Bancec presented the letter for payment, Citibank paid the amount sought less the value of its expropriated Cuban branches. *Id.* at 614-15. Bancec then brought suit in federal district court seeking to collect on the full value of the letter of credit and Citibank counterclaimed. *Id.* at 615.

The Court considered whether Bancec was liable on Citibank's expropriation claim; jurisdiction was not at issue in the case. *Id.* at 619-21. As we noted in *Holy See*, the Supreme Court "recognized a presumption of 'separate juridical status' " for subordinates of foreign states. 557 F.3d at 1077 (quoting *Bancec*, 462 U.S. at 624) (brackets omitted). The Court clarified that this presumption will be negated only (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) where recognizing the presumption "would work fraud or

injustice." *Bancec*, 462 U.S. at 629 (internal quotation marks omitted). Relying on the second, equitable prong, the Court held Bancec liable because recognizing its separate status would permit Cuba, the true beneficiary behind the by-then-defunct bank, to enforce the bank's claim against Citibank while simultaneously avoiding jurisdiction on the creditor's counterclaim against the Cuban government. *Id.* at 630-32.

We expressly adopted this analysis in *Holy See* and extended it to the jurisdiction phase of the FSIA, joining the Fifth and D.C. Circuits in so doing. 557 F.3d at 1078-79 ("Applying *Bancec*'s presumption—as well as the standard for overcoming that presumption—at the outset of a suit as well as at the merits phase makes good sense."). Turning to the facts of the case, we concluded that Doe's allegations were not sufficient under the *Bancec* standard to overcome the presumption of the Holy See's separate juridical status. *Id.* at 1079. Doe did not allege the required "day-to-day, routine involvement" by the Holy See in its subordinates' operations to establish the existence of a principal—agent relationship. *Id.* (citing *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002)). The fact that the Holy See created those entities and even regulated them was not enough. *Id.* at 1079-80. Nor was jurisdiction proper under the equitable prong. "Doe ha[d] not alleged that the Holy See . . . inappropriately used the separate status of the corporations to its own benefit, as in *Bancec*, or that the Holy See created the corporations for the purpose of evading liability for its own wrongs." *Id.* at 1080.

**[3]** The lay of the land after *Holy See* is thus considerably clearer. In determining "which of the acts alleged in the complaint may legitimately be attributed to the [foreign state] for purposes of establishing jurisdiction [under the FSIA]," we first must recognize that a foreign state has a presumption of separate juridical status. *Id.* at 1076, 1079. That presumption is overcome only if the complaint alleges "day-to-day, routine involvement" of the foreign state in the individual or corpora-

tion's affairs, *see id.* at 1079, or if maintaining the presumption would "work fraud or injustice," *see id.* at 1078-79.

## B.

Sachs's allegations do not withstand this scrutiny. Rail Pass Experts' sale of the Eurail pass cannot, under *Holy See*, be imputed to OBB. Like John V. Doe, Sachs "does not allege day-to-day, routine involvement of" OBB in Eurail Group, much less Rail Pass Experts. *See id.* at 1079. She alleges that Eurail Group is owned by and represents OBB and that Rail Pass Experts was in turn an agent for Eurail Group. But these facts fall far short of what the *Bancec* standard requires. In *Flatow v. Islamic Republic of Iran*, for example, we applied the *Bancec* standard at the merits phase to determine whether the actions of a bank could be imputed to Iran. 308 F.3d at 1069, 1071. Despite the fact that Iran nationalized and fully owned the bank, as well as proposed candidates for its board of directors, we held that these allegations were insufficient to negate the presumption of separate juridical status. *Id.* at 1071-74.

**[4]** The best Sachs can allege is that OBB, as a part-owner along with thirty other owners, wielded some degree of control over Eurail Group and was aware that Eurail Group used U.S. sales agents like Rail Pass Experts. But even these facts are not nearly enough under *Holy See*. Sachs has nowhere alleged that OBB was involved in Rail Pass Experts' routine, day-to-day operations, *see Holy See*, 557 F.3d at 1079; in fact, it is not clear that OBB was even aware that Rail Pass Experts existed. Nor is it alleged that OBB was involved in Eurail Group's affairs to this high degree. Eurail Group has its own independent management. The connection between OBB and Rail Pass Experts is not close enough under the first prong of the *Bancec* standard to overcome the presumption of separate juridical status and impute the sale of the Eurail pass to OBB.

**[5]** Nor would granting immunity to OBB "work fraud or injustice," *Bancec*'s second method for overcoming the pre-

sumption of separate juridical status. *See id.* at 1077-78 (quoting *Bancec*, 462 U.S. at 629). It is undisputed that OBB itself engages in no commercial activity in the United States, presumably in part to retain immunity from suit in American courts. Any injustice that results is no greater than in the mine-run of cases—jurisdiction over a foreign state is, after all, ordinarily not available. *See Verlinden*, 461 U.S. at 488. And this case is a far cry from *Bancec*, where Cuba, the real beneficiary behind a defunct bank, wanted to collect on the bank's claim against Citibank but deny jurisdiction on Citibank's counterclaim against the Cuban government. *Bancec*, 462 U.S. at 631-33; *see also Flatow*, 308 F.3d at 1072 ("[U]nlike in *Bancec*, [Bank Saderat Iran] is not attempting to use a United States court to recover on a claim while at the same time trying to avoid being the subject of an adversary proceeding."). There is no similar sleight of hand by OBB that would trump the presumption of its separate juridical status. *See Holy See*, 557 F.3d at 1079. OBB thus engaged in no commercial activity within the United States that would strip it of its immunity to suit.

## C.

The concurrence and dissent argue that the above precedent is not applicable to our case because in *Holy See* we considered the tortious act exception to immunity rather than the commercial activity exception. This distinction was not meaningful to our analysis in *Holy See*, nor should it be here.

Our opinion in *Holy See* contains expansive language regarding its applicability to FSIA cases. After deciding that the actions of the Archdiocese, the Order, and the Bishop were not attributable to the Holy See, we concluded that the plaintiff had "therefore not alleged sufficient facts to demonstrate that *any* exception to sovereign immunity applies to that cause of action." *Holy See*, 557 F.3d at 1080 (emphasis added). We also noted that "in applying the jurisdictional provisions of the FSIA, courts will routinely have to decide

whether a particular individual or corporation is an agent of a foreign state," and that "*Bancec* provides a workable standard for deciding this question." *Id.* at 1079. Nowhere did we indicate that this holding should be cabined to the tortious act exception and indeed such an interpretation would fly in the face of a plain reading of this language.

The question of which acts of a corporation or an individual may be imputed to the foreign state is preliminary to consideration of individual exceptions to immunity, as we have previously recognized: "Before turning to the question of which, if any, of the FSIA's exceptions to immunity apply, we must determine which of the acts alleged in the complaint may legitimately be attributed to the Holy See for purposes of establishing jurisdiction." *Id.* at 1076. There is nothing ambiguous in this holding. If we had wanted to restrict our analysis to the tortious act exception alone, we would have done so explicitly instead of using such sweeping language.

Nor does any of the precedent we cited in *Holy See* evince its exclusivity to the tortious act exception; if anything the caselaw suggests the opposite. *Holy See* borrowed its attribution standard directly from *Bancec*. *Id.* at 1079-80. But the Supreme Court in *Bancec* was not concerned with amenability to suit—its analysis focused on what acts could be imputed to the state for purposes of liability, which *Holy See* extended to jurisdiction, *id.* at 1077-78—so there is no reason why its standard would apply to one exception to immunity but not the others.

Most tellingly, in *Holy See* we expressly aligned ourselves with two other circuits that had extended this same *Bancec* analysis to the jurisdiction phase and that did so under the commercial activity exception. *Id.* at 1078; *see also Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 847-48 (D.C. Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-36 (5th Cir. 1992). That *Holy See* involved the tortious act exception did not seem to matter

when we relied on these cases for support in adopting the *Bancec* standard for the FSIA's jurisdiction phase. *Holy See*, 557 F.3d at 1078 ("The Supreme Court in *Bancec* did not have the opportunity to consider whether the actions of a corporation may be attributed to the sovereign . . . for purposes of determining whether jurisdiction over that sovereign exists. We have not previously addressed that question either. At least two other circuits, however, faced with such a scenario, have applied *Bancec*'s substantive corporate law principles in determining whether jurisdiction exists under the FSIA." (internal footnote omitted and italics removed)). By relying on two circuits that applied *Bancec* in the context of the commercial activity exception in a tortious act exception case, *Holy See* stands for the proposition, at least implicitly, that what immunity exception may or may not apply makes no difference to which actions of a corporation can be attributed to the sovereign.

Out-of-circuit caselaw confirms that the *Bancec* standard is applicable to the FSIA's jurisdictional provisions regardless of which exception is at issue. The standard is in no way unique to tort cases. Both *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d at 847-54, and *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d at 533-36, extended *Bancec* to the jurisdiction phase in cases involving the commercial activity exception. Likewise the Northern District of Illinois, *citing our decision in Holy See*, applied *Bancec* to this provision. *In re Potash Antitrust Litig.*, 686 F. Supp. 2d 816, 821-22 (N.D. Ill. 2010). Another district court decision extended *Bancec* to a case involving § 1605(a)(3), the "takings" exception, an entirely different exception to immunity. *Freund v. Republic of Fr.*, 592 F. Supp. 2d 540, 558-59 (S.D.N.Y. 2008). The dissent provides no case, in fact, that suggests that *Bancec* might apply to one of the FSIA's jurisdictional provisions but not to all. The absence of such authority is striking.

It is true, as the dissent notes, that we did not specifically consider the commercial activity exception to immunity in

*Holy See*, 557 F.3d at 1076, but it is unclear why this fact should make a difference in the present case. Our decision in *Holy See* viewed the question of which exception to immunity might apply as totally separate from the issue of which acts were attributable to the foreign state. The structure of the opinion supports this interpretation. The opinion has four subheadings in its "Analysis" section. The first two discuss the standard of review and jurisdiction over the appeal. The third is entitled "Determining Which Acts May Be Attributed to the Holy See for Jurisdictional Purposes," and in a fourth we finally address the tortious act exception. If the standard for determining which acts of a corporation were attributable to the sovereign were unique to the tortious act exception, it would have made sense to analyze them together. Yet in our discussion of agency/attribution we did not once mention the tortious act exception of § 1605(a)(5)—or any other exception for that matter—which would be odd if we were anchoring our analysis to the text of that statutory subsection alone.

Even if *Holy See* were only applicable to certain, but not all, of the FSIA's exceptions to immunity, the commercial activity and tortious act exceptions are closely tethered by the statutory text. "The tortious activity exception provides jurisdiction over tort actions not encompassed in the commercial activity exception 'in which money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state.' " *Joseph*, 830 F.2d at 1025 (quoting § 1605(a)(5)) (alteration in original).

There is nothing in our opinion in *Holy See* to suggest that we meant to restrict its applicability to the tortious act exception. Even assuming the decision is not directly controlling, given the opinion's language, precedent, and structure there is no intelligible reason why we should not apply it in a closely analogous case. The concurrence and dissent do not even attempt to explain by what limiting factor *Bancec* would

apply to the tortious act exception and not the commercial activity exception.

### D.

Even were we to accept the suggestion that *Holy See* is not controlling on this case, we reject Sachs's and the dissent's contention that *Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China*, 822 F.2d 11 (2d Cir. 1987), and *Kirkham v. Société Air France*, 429 F.3d 288 (D.C. Cir. 2005), elucidate our task. In each of these cases the court held that the commercial activity exception applied and that the foreign state was not immune from suit. But agency was undisputed in both *Kirkham* and *Barkanic* and thus neither squarely tackles the issue before us here: whether the acts of a separate entity may be attributed to the sovereign.

In *Barkanic*, the decedents purchased tickets for an internal Chinese flight on CAAC, the Chinese state airline, from a U.S. travel agency, which the court stated was "an agent for Pan American." 822 F.2d at 12. CAAC and Pan Am entered into a bilateral general sales agency agreement whereby CAAC would act as general sales agent for Pan Am in China and Pan Am would act as general sales agent for CAAC in the United States. *Id.* CAAC maintained offices and employees in New York and operated some flights out of U.S. cities. *Id.* The decedents' flight crashed, killing them, and their estates sued the airline. *Id.* The opinion focused on whether there was a sufficient nexus between the crash and CAAC's commercial activity within the United States, but the court never explicitly analyzed what qualified as "commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2); *see Barkanic*, 822 F.2d at 13.

*Kirkham* involved a woman who injured her foot at Orly Airport in Paris, allegedly due to the negligence of an Air France employee. 429 F.3d at 290. The plaintiff purchased her tickets from a U.S. travel agency; her trip included a flight on

United Airlines from Washington, D.C., to Paris and, four days later, a flight to Corsica on Air France. *Id.* The injury occurred at the airport prior to her second flight. *Id.* Again the court focused solely on whether the claim was based upon her ticket purchase without considering commercial activity, *id.* at 291-92, in this case because "Air France concede[d] the ticket sale constituted a commercial activity in the United States." *Id.* at 293.

The dissent interprets these cases to mean "that where a foreign common carrier, operated by a sovereign entity, purposefully sells tickets for use of the carrier's services overseas through a domestic sales agent, the ticket sale is commercial activity which may be imputed to the foreign common carrier." But this conclusion assumes the answer to the question we are tasked with answering: whether Rail Pass Experts is an agent of OBB at all. Agency was undisputed in *Barkanic*, 822 F.2d at 12, and *Kirkham*, 429 F.3d at 293, whereas here it is hotly contested. It is not enough to simply note that attributing the ticket sale to the airline went "without dispute between the parties and without suggestion from either the Second Circuit or the D.C. Circuit that to do so was inconsistent with the FSIA's commercial activity exception." We do not know why agency was undisputed and we should not speculate. But we cannot allow counsel's strategic decision to forego contesting agency in *Kirkham* and *Barkanic* to foreclose OBB's ability to do so here.

IV

**[6]** It is the judgment of this Court that the district court correctly dismissed this case for lack of subject matter jurisdiction.

**AFFIRMED.**

BEA, Circuit Judge, concurring in the judgment:

I concur in the majority's holding that the district court correctly dismissed this case for lack of subject matter jurisdiction. I write separately, however, because I agree with Judge Gould that the definition of agency in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) — a case concerning the *tortious act* exception to the Foreign Sovereign Immunities Act (FSIA) — need not be extended to the question of agency in cases concerning the *commercial activity* exception. This court's decision in *Sun v. Taiwan*, 201 F.3d 1105 (9th Cir. 2000) permits us to decide the case more narrowly, while assuming *arguendo* that an agency relationship exists between Rail Pass Experts (Experts), Eurail, and OBB Personenverkehr (OBB) which serves to impute the acts and omissions of Experts to OBB. I would affirm the district court on the basis that Sachs fails to allege facts sufficient to give rise to jurisdiction under *Sun*.

The FSIA provides immunity to foreign states in any action "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2). Sachs bases her claim of subject matter jurisdiction exclusively on the first clause of the commercial activity exception, so the relevant question in this appeal is whether her action "is based upon a commercial activity carried on in the United States by the foreign state."

In *Sun*, the Suns brought a wrongful death action against the Taiwanese government, a foreign sovereign, after their son drowned at a Taiwanese beach with claimed tricky tides, while on a trip sponsored by the Taiwanese government and advertised in the United States. 201 F.3d at 1106-07. This

court held that the FSIA barred the Suns' tort claim because the claim was not "based on" the marketing and ticket sales for the tour, the commercial activity carried on by Taiwan in the United States. *Id.* at 1109. The court held that the commercial activity exception does not apply if (1) the claim alleges negligence that occurred entirely in a foreign country, or (2) the claim alleges failure to warn and not negligent misrepresentation. *Id.* at 1109-10 & n.2. To allege a negligent misrepresentation claim that could confer jurisdiction, the plaintiff must show a nexus between failure to warn and commercial activity that occurred in the United States, *id.* at 1110, for example, by alleging failure to warn *on a ticket* sold in the United States or *in a United States advertisement.* Neither was alleged in *Sun*, until the Suns changed their theory of the case in their appellate brief. *Id.* The *Sun* panel noted this change, and it remanded the case to the district court for consideration of the Suns' amended negligent misrepresentation claim based on commercial activity which took place in the United States. *Id.*

Sachs does not allege facts sufficient to give rise to jurisdiction under *Sun*. Sachs's first set of claims — that OBB Personenverkehr (OBB) negligently moved the train, provided an unsafe place to board the rail car, failed to supervise boarding, negligently failed to stop the train, and breached various warranties — are all allegations of negligence that, for aught that appears, occurred entirely in Austria. Although Sachs does not state *where* these duties were violated, the only plausible reading of her complaint is that such acts and omissions took place in Austria. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (reviewing courts must draw on common sense to determine whether a claim for relief is "plausible").

Sachs's remaining claim is based on OBB's alleged failure to warn about the gap between the platform and the rail cars. This claim is stated broadly enough to constitute a claim of negligent misrepresentation, but the requisite nexus to an alleged act or omission in the Untied States is lacking. The

court in *Sun* expressly distinguished a failure to warn claim from a negligent misrepresentation claim, defining the latter as an *affirmative* duty to disclose "known information concerning prospective dangers." 201 F.3d at 1110 n.2. Sachs' complaint does not allege OBB negligently misrepresented its services by breaching a duty to disclose knowledge of the dangerous train platform conditions *in the United States at the point of sale* of train tickets. Instead, she alleges that there was commercial activity in the United States—OBB's advertising and sale of Eurail passes, both directly and through its agents Eurail and Rail Pass Experts—and then *separately* alleges that she should have been warned about the gap in the platform. To qualify as a negligent misrepresentation claim sufficient to confer jurisdiction under the FSIA under *Sun*, Sachs's complaint would have to allege that OBB should have disclosed, *on the ticket delivered in the United States*, *in their advertisements broadcast in the United States*, or in some other manner in the United States, of the known dangers of the gap. The facts as pleaded are insufficient to invoke jurisdiction under the FSIA.

I would deny Sachs leave to amend her complaint. As noted above, the *Sun* court remanded that case to allow the district court to review whether the Suns' new claim of negligent misrepresentation was based on commercial activity in the United States because the Suns "changed their theory of the case in their appellate briefs" from failure to warn in Taiwan, to negligent misrepresentation in the United States. 201 F.3d at 1110. Specifically, the Suns alleged they should have been warned in the advertising done by the Taiwanese government in the United States of the known danger of the treacherous tides at the Taiwanese beach. *Id.* Sachs, conversely, neither changes her theory of the case in her briefs on file to allege negligent misrepresentation in the United States of the dangerous train platform conditions in Austria, under

*Sun*, nor requests leave to amend for this purpose, despite prior amendment, and multiple briefs filed in district court.[1]

---

GOULD, Circuit Judge, dissenting:

The majority decides that the sovereign immunity of OBB Personenverkehr ("OBB"), a national railway of Austria, defeats at the starting gate a domestic forum for a negligence claim by a United States citizen who bought a Eurail pass in the United States. Sachs, in California, bought a Eurail pass from Rail Pass Experts, a Massachusetts-based sub-agent of the Eurail Group. The Eurail Group markets and sells rail passes worldwide, including within the United States. OBB is a part-owner of the Eurail Group, and the OBB trains carry Eurail customers in Austria. The Eurail pass permitted Sachs to board an OBB train and to sit in an unoccupied seat. Sachs was seriously injured while trying to board an OBB train in Austria. I believe that, for purposes of sovereign immunity, a sensible interpretation of the FSIA permits a domestic forum in which Sachs may assert her negligence or other claims against OBB, that our Ninth Circuit precedent does not prevent this, and that we should follow the general approach of other federal circuits that have decided in similar cases that ticket sales by an agent in the United States invoked the commercial activity exception to sovereign immunity in cases involving common carriers.

---

[1]Sachs did request leave to amend to plead facts that would show that the actions of Rail Pass Experts should be imputed to OBB. Had she requested leave to amend to allege that her claim is based on acts or omissions in the United States, this would be a much harder case. However, local rules require that a request for leave to amend must be accompanied by the proposed pleading, and Sachs proposed no amendment that would allege her claim is based on acts or omissions in the United States. N.D. Cal. R. 10-1.

I do not believe that *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) controls the outcome of this appeal. In *Holy See*, the district court concluded that the FSIA's commercial activity exception to sovereign immunity did not apply to the Holy See's activity, and the district court dismissed Doe's fraud claims alleged under that exception. *Id.* at 1071. Instead, the district court concluded that the Holy See's activity fit within the FSIA's tortious activity exception to sovereign immunity, and the district court denied the Holy See's motion to dismiss all of Doe's remaining claims alleged under the tortious activity exception. *Id.*; *see* 28 U.S.C. § 1605(a)(2) (commercial activity exception), (a)(5) (tortious activity exception).

The Holy See appealed that decision, and Doe cross-appealed the district court's order dismissing his fraud claim alleged under the commercial activity exception. *Holy See*, 557 F.3d at 1071. We declined, however, to consider Doe's commercial activity-based appeal. *Id.* at 1074-75. We concluded that we did not have jurisdiction because Doe's appeal, unlike the Holy See's appeal, did not fall within the collateral order exception to the final judgment rule, and "the tort causes of action [that were relevant to the Holy See's appeal were] not inextricably intertwined with Doe's other claims." *Id.* at 1075. We said:

> In other words, here we would be asked to take up the appeal from that grant and reverse the district court's determination; we would have to reach out and engage in a lengthy disquisition on the commercial activity exception to FSIA, which we neither must nor should do. *Thus, we will not consider issues regarding the district court's grant of immunity under the commercial exception to the FSIA.*

*Id.* at 1076 (emphasis added).

We went on to extend the presumption in favor of separate juridical status at the liability phase, identified by the

Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), to the jurisdiction phase of the FSIA inquiry. *Holy See*, 557 F.3d at 1079. We did this even though in an earlier case we explained that "[t]he enumerated exceptions to the FSIA provide the exclusive source of subject matter jurisdiction over civil actions brought against foreign states" and that "*[q]uestions of liability* are addressed by *Bancec*, which examines the circumstances under which a foreign entity can be held substantively liable for the foreign government's judgment debt." *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002) (emphasis added).[1]

Because we did not expressly consider the commercial activity exception in *Holy See*, it is not controlling. Because both *Bancec* and *Flatow* deal with separate juridical status for the purposes of liability, neither mandates the majority's approach to resolving this appeal. I would, instead, follow the decisions of the Second Circuit in *Barkanic v. General Admininstration of Civil Aviation of People's Republic of China*, 822 F.2d 11 (2d Cir. 1987) and of the D.C. Circuit in *Kirkham v. Société Air France*, 429 F.3d 288 (D.C. Cir. 2005). The courts in *Barkanic* and *Kirkham* expressly considered the commercial activity exception to sovereign immunity under the FSIA in the context of the sale of foreign common

---

[1]*Flatow* also does not preclude a ruling in favor of Sachs because our inquiry there, like the Court's in *Bancec*, centered on the question of liability, and not jurisdiction, as permitted under the commercial activity exception to sovereign immunity under the FSIA. *See id.* at 1069 ("The distinction between liability and jurisdiction is crucial to our resolution of this case."). We declined to permit the appellant to levy against real property owned by Bank Saderat Iran ("BSI"), a nationalized bank, in order to satisfy a default judgment against the Republic of Iran. *Id.* at 1066. Relying on *Bancec*, we concluded that Flatow did not allege facts sufficient to overcome *Bancec*'s presumption of separate juridical status at the liability phase. *Id.* at 1074. In short, under the presumption of separate juridical status for the purposes of liability, BSI could not be held liable for the Republic of Iran's obligation to Flatow.

carrier tickets in the United States by travel agents. Although there are some distinctions of fact in those cases,[2] I read them to mean in substance that where a foreign common carrier, operated by a sovereign entity, purposefully sells tickets for use of the carrier's services overseas through a domestic sales agent, the ticket sale is commercial activity which may be imputed to the foreign common carrier and is sufficient to invoke the commercial activity exception to sovereign immunity under § 1605(a)(2) of the FSIA.

*Barkanic* and *Kirkham* are consistent with the plain language of the FSIA, which does not require the limitation to jurisdiction under the commercial activity exception relied on by the majority. Section 1605(a)(2) provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . *in which the action is based upon a commercial activity carried on in the United States by the foreign state*; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act out-

---

[2]In *Kirkham*, Kirkham bought an airline ticket from a travel agent in Washington, D.C. for travel on Air France in Europe. *Kirkham*, 429 F.3d at 290. Kirkham was injured in a Paris airport while changing planes, and she sued Air France, whose majority shareholder is the Republic of France. *Id.* In *Barkanic*, Barkanic bought a ticket to fly on CAAC, an agent of the People's Republic of China, from a Pan Am-affiliated travel agent in Washington, D.C. *Barkanic*, 822 F.2d at 12. Pan Am and CAAC had previously entered into an agency agreement in which Pan Am was authorized to appoint travel agents to sell seats on CAAC flights. *Id.* Barkanic was killed when his CAAC flight crashed in China, and his survivors filed a wrongful death suit against CAAC. *Id.*

In neither case was the issue of whether the commercial activity (i.e., the sale of the airline ticket in the U.S. by a travel agent) could be imputed to the sovereign raised. Instead the sale of the ticket was attributed to both foreign carriers without dispute between the parties and without suggestion from either the Second Circuit or the D.C. Circuit that to do so was inconsistent with the FSIA's commercial activity exception.

side the territory of the United States in connection
with a commercial activity of the foreign state else-
where and that act causes a direct effect in the
United States.

28 U.S.C. § 1605(a)(2) (emphasis added). "Commercial activ-
ity" is defined as "either a regular course of commercial con-
duct or a particular commercial transaction or act," *id.* at
§ 1603(d), and a "commercial activity carried on in the United
States by a foreign state" is defined as "commercial activity
carried on by such state and having substantial contact with
the United States." *Id.* at § 1603(e). The legislative history
notes that Congress intended the commercial activity excep-
tion to apply to "a broad spectrum of endeavor, from an indi-
vidual commercial transaction or act to a regular course of
commercial conduct." H.R. Rep. 94-1487 at 6614-15.

Here OBB is a member and part owner of Eurail which tar-
gets U.S. consumers, selling thousands of passes each year for
use on railways, including on OBB, throughout Europe upon
one purchase of a pass. That Eurail does this through sub-
agents like Rail Pass Experts[3] in the United States does not
change that OBB, through Eurail, regularly engages in the
type of commercial activity in the United States that Congress
intended to defeat sovereign immunity under the FSIA.
Indeed, a primary purpose of the Eurail entity is to market and
sell in the United States and around the world Eurail passes
good only for passage on OBB and other European railways.
Stated another way, OBB knew that the Eurail entity, in
which it was part owner, would be marketing passes to people
like Sachs in the United States. It knew or should be charged

---

[3]Before the district court, OBB argued that Rail Pass Experts is not an
authorized agent of OBB. OBB acknowledges, however, that OBB is a
member of the Eurail Group and that "Rail Pass Experts may be, presum-
ably, a subagent of a general sales agent accredited by The Eurail group
and, therefore, able to sell Eurail passes (likely at higher rates than those
available from Eurail directly)."

with constructive knowledge that Eurail would use sub-agents like Rail Pass Experts to sell tickets to people like Sachs within the United States. *See Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307-08 (9th Cir. 1997) ("Because a foreign state acts through its agents, an agent's deed which is based on the actual authority of the foreign state constitutes activity 'of the foreign state' [for the purpose of the commercial activity exception]."). OBB has empowered its agent, the Eurail Group, to sell passes good for travel on OBB trains, including through sub-agents like Rail Pass Experts within the United States. *See id.* Moreover, when a U.S. citizen buys a Eurail pass in the United States for passage on OBB and other railways from an agent in the United States, and then is injured through allegedly improper activity of the foreign railway carrier, like OBB in Europe, such a person should be able to have a forum for suit within the United States so far as sovereign immunity is concerned.

I also believe that Sachs' action is sufficiently "based upon" OBB's commercial activity as is required by the FSIA. 28 U.S.C. § 1605(a)(2). In *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Supreme Court explained that within the context of the FSIA, "the phrase ['based upon'] is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357. Indeed, "[t]he only reasonable reading of ['based upon'] calls for something more than a mere connection with, or relation to, commercial activity." *Id.* at 358.

Here, Sachs' first claim for relief is based on negligence. She alleges that OBB, as a "common carrier for hire," breached its duty of care when Sachs was injured boarding the OBB train in Innsbruck, Austria. This duty arose from the sale of the ticket for passage on OBB trains, the commercial activity identified by Sachs. *See* Restatement (Third) of Torts § 40(b) (2012) ("Special relationships giving rise to the duty [of reasonable care] . . . include a common carrier with its passengers."). Thus, the commercial activity, on which Sachs

argues that the commercial activity exception to sovereign immunity should apply here is a necessary element (i.e., establishment of the duty of reasonable care) that, if proven, would entitle Sachs to relief on a least some part of her action against OBB. *See Nelson*, 507 U.S. at 358 n.4 ("We do not mean to suggest that the first clause of § 1605(a)(2) necessarily requires that each and every element of a claim be commercial activity by a foreign state.").

A judgment in favor of Sachs is also consistent with our decision in *Sun v. Taiwan*, 201 F.3d 1105 (9th Cir. 2000). In that case, we considered whether the appellants could bring a wrongful death action against Taiwan under the commercial activity exception to sovereign immunity under the FSIA after their son drowned on a Taiwanese beach during a cultural tour of that country. Before the district court, appellants only alleged "a negligent failure to warn and failure to exercise reasonable supervision." *Id.* at 1109. We clarified that the phrase "based upon . . . requires a nexus between the action and the commercial activity." *Id.* We then reasoned that although Taiwan's operation of the tour was commercial activity within the meaning of the FSIA, *id.* at 1108-09, only "administrative promotion and application management took place in the United States." *Id.* at 1110. Specifically, we said that the basis for the Suns' claims of negligent supervision and failure to warn claims lay in the sovereign's alleged conduct *in Taiwan*, on the Taiwanese beach, and had no nexus with the admitted commercial activity *in the United States*; namely the promotion and sales of tickets for the tour. *Id.* Because "[t]he only conduct relevant to the action was failure to take reasonable care in allowing the students to swim and failure to supervise them," all of which took place in Taiwan, we concluded that the Suns were unable to show a nexus between the action and the commercial activity *within the United States*.[4] *Id.*

---

[4]The Suns then changed their theory of liability on appeal, arguing that under California law, "Taiwan was under an affirmative duty to exercise

Here, by contrast, Sachs' negligence action alleges that OBB breached its common-carrier duty of reasonable care in the operation of its trains, causing her physical harm. As stated above, this duty originates in the commercial activity that Sachs alleges, namely OBB's sale of the train ticket, through its participation in Eurail, which occurred *in the United States*. I would conclude that there is a sufficient nexus between Sachs' action and the commercial activity. *Accord Barkanic*, 822 F.2d at 13 (concluding that "there is a sufficient nexus between the airplane crash and [the sale of the airline ticket] carried on by [the sovereign] in this country").

Because I believe (1) that the Eurail Group, through ticket sales by its sub-agent Rail Pass Experts, engaged in commercial activity within the United States, and that this activity is fairly attributed to OBB as part-owner of Eurail, carrying its customers in Austria, and (2) that there is a sufficient nexus between that commercial activity and Sachs' action because the ticket sale gave rise to the common carrier duty of reasonable care allegedly breached, I would hold that Sachs has alleged facts sufficient to satisfy the commercial activity exception to sovereign immunity under the FSIA. I respectfully dissent.

---

reasonable care by disclosing known information concerning prospective dangers on the tour and by not misleading prospective participants," while promoting the tour in the United States. *Id*. We then remanded the case to the district court "to review the Suns' claim first in order to determine whether, as currently cast, it is based on commercial activity that took place in the United States." *Id.*